[Crim. No. 13472. Second Dist., Div. One. June 3, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN LOYDE AIRHEART, Defendant and Appellant.

Michael G. Steiniger, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Larry Ball, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of robbery in the first degree.

In an information filed in Los Angeles on October 21, 1965, appellant herein and Charles Doescher were jointly charged with robbing Robert Pearce on September 24, 1965, of about $1,700 in money. It was further charged that at the time of the commission of the offense defendants were armed with a deadly weapon and further that at the time of the arrest said defendants were armed with deadly weapons. It was also charged that appellant previously had been convicted of burglary in the State of Louisiana in February 1964 and had served in prison therefor. Doescher pleaded guilty to first degree robbery; the allegation with reference to being armed at the time of the commission of the offense as to him was stricken upon motion of the district attorney. Appellant pleaded not guilty and ultimately admitted the charge of the prior conviction. In a jury trial appellant was found guilty of robbery in the first degree and of being armed at the time of his arrest and of not being armed at the time of the commission of the offense. He was sentenced to the state prison for the term prescribed by law. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: On September 24, 1965, Robert Pearce was employed as an assistant manager of a market located on North Western Avenue near Franklin Street in Hollywood. At about 9:45 p.m. on the date above mentioned Pearce was summoned by a checker then on duty. As he approached the checker she told him that a prospective customer wished to talk with him. She pointed to a man standing near the outside of her check stand. Pearce proceeded toward the man to ascertain what he wanted. The man, who turned out ultimately to be Doescher, approached Pearce, lifted his shirt and exhibited a revolver in the waistband of his trousers. Pearce was directed by Doescher to go to the office of the store and Pearce complied with the command. As Pearce and Doescher so proceeded to the office a third man, who ultimately developed to be appellant, followed closely. Pearce and Doescher entered the office followed by appellant. Pearce complied with a command to place the money in a sack by placing about $1,700 in cash in a bank-type sack then, as directed, walked to the front of the store with the money in the sack accompanied by Doescher and appellant. The latter two then took the sack and left the store. The lighting conditions in the store and in the office were very good. Pearce had a good view and look at appellant for about three or four minutes.

Steven Lindstrom, a clerk in the store at the time and place noticed Pearce walking toward the office with Doescher and appellant close by. Lindstrom noted that Pearce was red-faced and nervous, and he thought that something untoward was taking place. As Lindstrom passed Pearce the latter mouthed something like ''cops'' and Lindstrom was sure that something was wrong. Lindstrom attempted to locate a telephone not in use or someone to summon for assistance. He saw the two robbers leave the store and saw them leave the parking lot in a dirty white Pontiac car. Lindstrom was within 3 or 4 feet of appellant and got a look at him.

The police were called and Pearce and Lindstrom provided the officers with descriptions of the robbers.

At about 11 p.m. of the same date, Officer Westray of the City of Downey was on regular patrol duty in an unmarked car. He was in the area of a parking lot of a bowling alley near Firestone and Reeves Streets. Officer Westray noticed appellant exit from a dirty white Pontiac car and enter a supermarket on the east side of Reeves Street. It was near closing time and the officer decided to watch the car for a time. The officer drove toward the rear of the Pontiac car in

order to secure the license number. As he did so the three remaining persons in the car turned around. The officer parked his car about 50 feet from the Pontiac car. Two of the men in the Pontiac then exited the car and entered the market. One man, in the driver's seat, was still in the Pontiac car; however, in about three minutes he entered the market, leaving the engine of the car running. The officer called his department for assistance. Appellant and two of the men returned from the market and got into the Pontiac car. Westray approached the car and looked for identification. The car carried Louisiana license plates. Appellant produced a Texas driver's license. Officer Engler arrived and drove up to the Pontiac car. Westray noticed the man who had been the last to enter the market starting to leave the market and to walk away from the scene. Engler brought him back to the car. Westray asked to whom the car belonged and appellant responded that it belonged to the man who was in the market. Engler approached the car with the man who had attempted to walk away from the scene and the man was asked if the car belonged to him and he replied "No" and denied any knowledge of the car or acquaintanceship with the men in the car. Westray again asked to whom the car belonged and none of those present could or would make a claim of ownership of the Pontiac car. The manager of the market came out of the store and told Westray that the man who was supposed to be in the store and the car's owner had left the market and was last seen running eastbound down the railroad tracks behind the market. The Pontiac car was then searched and three loaded revolvers were found under the front seat. Appellant was seated in the right front seat over one of the guns. The men including appellant were then arrested. One of the guns was identified by Pearce as resembling the gun in the waistband of Doescher at the robbery.

About a week after the robbery Pearce and Lindstrom attended a police lineup at the police building. There were about 14 men in the lineup, two of whom were Negroes and some of whom were of Mexican extraction. Pearce and Lindstrom had driven to the police building for the lineup and they sat together. No policeman sat with them although, of course, there were policemen in the room. Pearce and Lindstrom, so to speak, were left alone while they studied the men in the lineup and neither of them had any discussion with the officers as the lineup progressed. Pearce and Lindstrom separately and each for himself wrote down the numbers of the men who participated in the store robbery. Appellant was

identified as being one of the robbers at the preliminary hearing and at the time of trial.

The prosecutor further introduced evidence to the effect that while awaiting a court appearance in the case appellant had escaped from custody in the Brunswick Building.

Appellant did not see fit to testify in his own behalf and state that he was not one of the robbers.[1]

Appellant now asserts that the conduct of the police lineup and the subsequent identification by Pearce and Lindstrom were improper and deprived him of due process of law, that the prosecutor's use of certain confidential "jury lists" during *voir dire* examination of potential jurors deprived him of a fair trial and lastly that the arresting officers conducted an illegal search of the Pontiac car and the weapons found in the search were improperly admitted into evidence. We are persuaded that there is no merit to appellant's contentions.

Admittedly the case was tried before the decisions of *United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d

---

[1]The transcript records that his attorney in the chambers of the judge prior to the taking of any evidence and in the presence of defendant stated:

"Mr. Whyte: Your Honor, for the record, I did indicate to Mr. Airheart, my client in this case, my sentiments and that they had been expressed to the Court in the presence of the District Attorney's Office, and that notwithstanding, I also indicated to the Court—this is what I told Mr. Airheart—that Mr. Airheart felt very strongly about going to the Penitentiary for First Degree Robbery, when he didn't feel he was guilty of that. I told him quite clearly that I felt that a First Degree Robbery, with the prior stricken, and the allegations of an armed weapon, and the like, stricken, would be in my opinion a very excellent disposition, in view of all the circumstances.

"I believe this more or less reflects what might have been discussed by counsel with his Honor out of the presence of the defendant. It is now discussed in the presence of the defendant.

"When we answered 'Ready,' Mr. Airheart said that—he then asked me the question, after I had told him that I felt first degree, under the circumstances, in my considered opinion as his counsel, was a good disposition, he then indicated, did I wish to continue in the case.

"I said I did, but that very point I would want to be clear in the record, that I do wish to continue in the case and to make a good defense for him, but I want the record to be clear in Mr. Airheart's mind, or at least have the Court satisfied that if I keep in the case—I might have made those other suggestions, but as long as I am in it, it is an all-out fight."

The defendant in the same conversation said among other things:

"The Defendant: It is just the idea. I don't want to go to the penitentiary for anything. I didn't have a pistol. Never—" and:

"The Defendant: Your Honor, I really believe the man would defend me because he has been doing an exceedingly good job. It is just the facts coming up, like the illegal search and seizure, right there, that is ground for a dismissal, I feel, anyway."

678

1178, 87 S.Ct. 1951]. The rule of those cases operates prospectively (June 12, 1967). (*Stovall* v. *Denno,* 388 U.S. 293, 296 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967].) ■ Appellant places complete reliance on what was said in *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336] and argues that the lineup at hand was "even more unfairly constituted" than the lineup in *Caruso, supra,* and the conduct of the police infringed appellant's right to due process of law.

A reading of the *Caruso* case indicates that about the only similarity between that case and the case at hand is that each appellant was charged with robbery. In *Caruso* the robber wore a handkerchief over the bridge of his nose—appellant here had nothing covering his face. In *Caruso* the victims or witnesses saw the robber for only a matter of 30 seconds or so—appellant was observed for several minutes under excellent lighting conditions at a distance of about three to four feet. One of the witnesses in *Caruso* could not recall the robber's physical appearance—no such deficiency appears with reference to appellant. In *Caruso* the court said that the lineup was so conducted as to suggest to the viewers who the robbers were—in the case at hand nothing occurred which would promote any suggestion to the viewers. In *Caruso* the opportunity for observation was a fleeting glance—here the exact opposite was true. *Caruso* had a persuasive alibi, corroborated by witnesses to the effect that he was 40 miles from the scene of the robbery—here there was no evidence presented by appellant as to where he was at the time of the robbery, indeed he said nothing. The original record, which we have perused in accordance with the Rules of Court, recites that appellant advised the probation officer that he knew of the robbery but that he was not in it. In *Caruso,* despite intensive police interrogation Caruso maintained his innocence, the court saying that no motive was ever established; Caruso was employed, married and the father of several children with no pressing need for money and with no prior criminal record. Appellant in this case was under a hold from the San Diego Police Department for a robbery in that area and further the Louisiana authorities had a hold on appellant for a possible parole violation. There is no evidence in the case at bench of any overreaching of appellant—there is no evidence whatsoever that the in-court identification of either Pearce or Lindstrom came from the viewing of appellant at the lineup. All of the evidence is to the effect that each of the eyewitnesses of the robbery made his identification from his viewing of appellant in the store during the course of the robbery. The totality

of the circumstances indicates clearly that the lineup proceedings were fair and proper. There was no impairment in the lineup of the accuracy of the first view or observation of appellant at the robbery. Even had the lineup been improperly conducted the identification here of appellant at the trial was not the product of any such claimed impropriety—but was based upon the independent knowledge secured from observing appellant committing the crime in question. (See *Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

■ The use by the prosecution of a jury list did not result in the deprivation of a fair trial. This court has previously expressed its view on such jury book lists in *People* v. *Darmiento,* 243 Cal.App.2d 358, 368-369 [52 Cal.Rptr. 428]. Justice Magruder in *Best* v. *United States,* 184 F.2d 131, 141, stated with reference to such lists :

''Appellant advances the further point that the trial judge erred in denying his motion, at the time the jury was being empaneled, to be allowed to inspect and use a report of the F.B.I. of its investigation of members of the venire. It appears that such a report was in the hands of the prosecution, but the U.S. Attorney denied that the F.B.I. had made personal contact with any juror in the course of the investigation, and the record contains no indication to the contrary. We know of no authority for the proposition that the accused in a criminal case has a peremptory right to inspect such a report; indeed the intimation of the cases is the other way. [Citations.] Prospective jurors were extensively, and we think adequately, questioned by the trial judge in aid of the defendant's exercise of his right of challenge. It is pure speculation whether the report would have been of any additional assistance to the defense in this regard. There is no basis in the record for a suggestion that the jury was not impartial or that it did not fairly consider the issues presented to it. The record does show that the district judge exhibited from start to finish marked solicitude for protecting the rights of the accused. Assuming that it was within the discretion of the trial judge to permit inspection of the F.B.I. report, we cannot say that there was any abuse of discretion in denying the motion in this case.''

Justice Barnes in *Hamer* v. *United States,* 259 F.2d 274, 280-281 wrote :

''We have examined the jury book used by government counsel. The use of 'jury books' showing how members of a

jury panel voted on previous juries has long existed in our courts. It has been praised and criticized; attacked and defended. Many an experienced trial lawyer will insist that knowing how a juror votes on one case will not give the slightest indication how he or she would vote on another, even if it is the same kind of case. If the facts differ, it is a different case, and different pressures, feelings, and sympathies come into being. And, of course, facts do differ in each narcotics case; in each tax case; each personal injury case; and each case of any 'type' or 'kind.'

"Whether the United States District Attorney's staff in any district keeps a 'jury book' or not (written or mental), whether it keeps a black-list of the few 'sympathetic jurors,' or a white list of the few 'hanging jurors,' cannot be considered error per se. Any group of attorneys associated together for any reason, who are constantly engaged in the trial of cases, will discuss and communicate as much information and knowledge as they possibly can to each other. Defense counsel, though perhaps not with the same enthusiasm, will discuss and relay information about jurors—'good' or 'bad,' as they may appear to interested partisans—just as the same information passes around with even greater frequency within the legal profession as to the judges themselves. In any jail or place of incarceration the 'easy' and the 'hard' judges are sought or evaded or avoided, if such be possible and any choice exists.

"But, says appellant, the list here was more than mere reputation. It contains references to how the jurors voted. It must be conceded that with respect to the reference to two jurors having 'held up' a jury for 'four' or 'several' hours, such notation purports to pass along information as to what happened within a jury room.

"Again, as any jury trial lawyer knows, it is almost impossible to prevent eleven jurors who have been held from a decision for several hours by *one* who saw the matter the other way, from publicly expressing their displeasure or disgust. The proverbial request by the foreman of the hung jury 'for eleven dinners and a bale of hay' is well known to all.

"If counsel for this defendant had tried cases before some of the jurors on this panel and had received information or come to any conclusions with respect to their individual intelligence, attentiveness, or sympathetic attitude, he would have felt he was negligent toward his client's interest had he not utilized his knowledge, or his intuition, to his client's best advantage.

"We are not impressed with the argument that under any and all circumstances, and irrespective of what may be in a jury book, its use should be declared to deprive a defendant of a fair jury trial. To carry such a theory to its ultimate and ridiculous conclusion, no defendant could be prosecuted by a government attorney who had more information about how jurors on that panel had voted, in other cases, than his own counsel had. If defense counsel chosen was trying his first case before that panel, must the government hire a lawyer who likewise has tried no cases before that same jury panel? Is a defendant, in the name of his constitutional rights, entitled to be prosecuted by a government prosecutor with no more experience than his own counsel, or vice versa? If so, how is such experience to be measured? If the government lawyer is a tyro, must a defendant replace his more experienced defense counsel? Such a proposed rule would break down law enforcement in this country. It cannot be seriously considered. Perfect equality in counsel can never be achieved, any more than there can be two judges, or groups of judges, with precisely similar competence.

"We think that it is up to the individual judge to see that neither attorney has an unfair advantage over the other, whether by use of jury lists or jury books, or any other knowledge or information that exists with respect to a juror's previous action." (Footnote omitted.) It was not improper to use a jury list as used in this case.

 The search of the Pontiac car under the circumstances was proper and reasonable. It is to be remembered that it is only unreasonable searches which are prohibited. It was recognized by the framers of the Constitution that there were reasonable searches which could be made and for which no warrant was required. It has been stated over and over that what is reasonable is not to be determined by or from any fixed formula and the Constitution does not define what are unreasonable searches, and it has been said, "in our discipline we have no ready litmus-paper test." (*United States* v. *Rabinowitz*, 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430].) The recurring questions of the reasonableness of the search must find resolution in the facts and circumstances of each case. Here it was not unreasonable for the officer to believe that the Pontiac car was a stolen vehicle. No one in the car would claim ownership; the police were told that a man in the store owned it; all within a moment or so one man from the store denied any knowledge of the car or of its occupants and the other man

who had been in the store went running away down the tracks. The officer said, "I think the car is hot" and then made the search. The search was proper.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.