[Crim. No. 7166. First Dist., Div. One. June 27, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES L. ELDER, Defendant and Appellant.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

Ronald E. Mallen, under appointment by the Court of Appeal, and Long & Levit for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Eric Collins, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant appeals from a judgment of conviction rendered after a trial by the court in which he was found guilty of burglary in two counts (Pen. Code, § 459), and assault with intent to commit rape (Pen. Code, § 220). He contends that his in-court identification was predicated upon an unfair lineup and constituted a denial of due process; that it was prejudicial error to admit evidence of the details of his prior conviction for burglary; and that the evidence is insufficient to sustain the convictions. These contentions are examined, and it is concluded that there was no prejudicial error in the trial of the case. The judgment must be affirmed.

*General Facts*

At about 3 a.m., on the morning of April 14, 1967, Mrs. H. was sleeping in her attic apartment on the third floor of a house on Oak Street, San Francisco. Her sons, Jack, age 14 and George, age 12, were sleeping in separate beds in the same room. Mrs. H. was awakened under the circumstances related below in connection with the discussion of the sufficiency of the evidence, when she saw an individual leaning over her. She subsequently called to her sons for help. Her son Jack came to her assistance and struck the intruder with a baseball bat. Other details are related under the discussion of identification evidence. The assailant then ran out taking a bat with him. He was a small Negro male with round eyes. Mrs. H. could not identify defendant as the man. There was blood in the apartment, on the sheets, on her heel, and outside for some

way up the sidewalk. Neither the door to her apartment nor the building had been locked that night.

Jack generally corroborated his mother's testimony concerning the. actions of the intruder. He saw blood on his mother's bed, on his brother's bed, and there was also blood on Jack's underclothes and left arm.

Blood samples were taken from Jack and Mrs. H. Jack had type A and his mother type B blood. A band-aid taken from the defendant was tested for blood stains which were found to be type O. The bed sheets and the T-shirt worn by Jack were stained with Group O type blood. Type O is found in about 40 to 43 percent of the population, type A in 10 to 20 percent, and type B in about 6 percent.

Two days later, on April 16, 1967, at about 12:30 a.m., Janet B. age 10½, was sleeping three in a bed with her girl friends Ellen and Mary. Janet resided with her parents in San Francisco in an apartment on the third floor of a Page Street dwelling. Her girl friends were visiting for the night. The three girls were sleeping cross-wise on the bed. Janet was awakened under the circumstances related below in connection with the discussion of the sufficiency of the evidence, and discovered a strange man in the room. When the girls screamed the intruder left the room. The girls put on the light, jammed a chair across the door and Ellen telephoned her mother and then the police. Mary and Janet opened the door and tried to get out of the house. Mary looked down and saw the man walking up and down carrying a kitten. The girls closed the door again and heard a person walk down the hall and come up to the door but no attempt was made to force it. The next thing they heard was running on the stairs; someone was slammed against the door and there was shouting. The girls went outside and saw the defendant standing in the corner with the police holding him, and a flashlight under his chin. This was the first time that Janet got a good look at his face. Ellen K., Janet's friend, age 13, corroborated Janet's testimony and identified defendant, over objection, as the person she had seen inside the room, as well as afterwards outside the room. She agreed that the room was generally dark and said that the closest she was from the assailant's face was about 2 feet. She indicated that she did not "see much of him in the room" and saw him outside the room.

Officer Tovani of the San Francisco Police Department was on patrol with Officer Langlois about 2 blocks away when they received a prowler call. They responded immediately, noticing

a man and woman, whom Tovani later learned to be one of the girls' parents, running up the middle of the street toward them as they were alighting from the car. He went up the first flight of stairs and into the vestibule. Ahead of them was a long flight of stairs, and as they started up, they saw defendant coming down toward them. The officers ordered defendant to stand still but he turned around and went back up the stairs. They caught the defendant in the small vestibule at the top of the long stairway and at once placed him in custody. He had a band-aid over his right temple. After asking the girls to identify him, the officers arrested defendant and admonished him.

Defendant said he had been drinking on Haight Street and had met a friend there. This friend had invited him to come to his home on Page Street, which was about four houses from the end of the block. The friend said that the door would be open and that defendant could just walk in. The defendant also said that while he had been drinking in the Fillmore district he had met some friends and had gone for a ride in a car which was subsequently involved in an accident. He indicated he had bumped his head at the time of the accident, and had sustained a head injury. The officer denied that defendant said he got the head injury in a fight on Haight Street.

Inspector Mino interviewed defendant on April 16th at about 3 or 3:15 p.m. The inspector asked him how he had received an injury over one eye. Defendant replied that he had been struck and knocked down in a fight over gambling with some man by the name of Roscoe on April 13th. He said that the fight took place on Carl Street.

Mrs. Marylou W. and her former husband testified, over objection, to the details of an incident in Los Angeles which resulted in defendant's conviction of burglary in 1960, as set forth below under the discussion of evidence of other offense.

Defendant testified that about 7:30 p.m. on the evening of April 13th he was at the I-Thou coffee shop. He then went to John Fleming's residence on Carl Street for dinner but he was not home so defendant went to the Haight Levels where he played chess with a man, whom he only knew by the name of "Robert." About 9 p.m. he went to another coffee shop, the Drug Store Cafe, where he remained for about two hours. He then went home to sleep. He did not leave his room. He never went to Mrs. H's residence. Upon cross-examination he

testified that he did not have a roommate nor did he associate with anyone in particular that evening. Defendant testified that he had been in a fight with a man named "Roscoe" over a gambling debt at 6 p.m. that evening. He was knocked to the pavement and injured his forehead. He denied telling Officer Tovani that he had received the injury in an automobile accident. He admitted telling Inspector Mino that he had been involved in a fight with "Roscoe," but he denied telling him that the fight was on Carl Street. Defendant testified that the fight was in North Beach.

Defendant testified that on the evening of April 15th, he arrived at a party on Steiner Street at about 9:30 p.m. He stayed there for about two hours and left to go to a party on Page Street which he was told was in a residence near the corner of Cole Street. He did not know which apartment it was so he entered the one which had an open door. He went up the first flight of stairs. It was very quiet; he assumed he had gone to the wrong building. He turned to go back down the stairs when the police officers entered and arrested him. He claimed that he never entered Janet's room, nor even saw the girls until the officers stopped him and the girls came down the stairs.

John Fleming also testified on behalf of the defendant. He said that after Inspector Mino had testified, Mrs. H. and Inspector Mino had a conversation. He was able to overhear parts of it. He was in the front row of one side of the seats while they were in the second to the last row on the other side. He heard Mrs. H. say, "Is that the man?" and the inspector said, "Don't you know?" at which she said, "I'm not sure." After a while they began to talk about other things. Mr. Fleming agreed that he lived at 51 Carl Street, that Elder had worked for him and that he, Fleming, had been convicted of a felony.

*Identification Evidence*

The first victim's 14-year-old son testified that he was awakened by his mother's scream and saw a man humped over his mother's bed; that he heard the man say, "Shut up or I'll kill you," and his mother say, "Get out of here. There's two little boys in the room." After a period of silence he heard his mother entreat, "Help, Jack, George, he's trying to kill me." He went for a baseball bat and his brother went for the light. He hit the intruder over the head with the bat. The intruder took the bat away, and pushed the witness

against the window. The curtain opened as the witness fell back against the window and in the light from the exterior he saw the left side of his assailant's face 1 or 2 feet in front of him. Just before the intruder got out of the room the witness' brother turned on the light and the witness saw the intruder full face as he was falling back toward the door. The intruder stumbled down the stairs and out of the house.

An objection was interposed to the prosecutor's question, "Do you recognize this man sitting here next to counsel as the person you saw on that evening?" but only after the witness had given an affirmative-answer, which was then stricken. The objection was predicated on the dual grounds that the question was leading and suggestive and that no foundation had been laid for an in-court identification under the most recent decisions of the Supreme Court. The objection was sustained on the ground that the question was leading. Thereupon, the witness was asked, "Do you recognize the person that was in your room on that particular night?" After answering "Yes," without further objection, the witness identified the defendant as the intruder, and reiterated that he had been able to observe him on the particular night the offense was committed.

On cross-examination defense counsel questioned the witness concerning his opportunity to observe the appearance of the intruder, what was actually observed by him, and his general ability to distinguish different individuals of the Negro race. He then tested the witness by reference to the differences in appearance between the intruder he observed and another Negro who was present in court to testify for the defendant.

Defense counsel then elicited that there had been a lineup at which the witness identified the intruder without previously having been shown any photographs, or having been given any suggestions by the police.

The prosecutor then produced (and ultimately introduced into evidence without objection) a photograph of a lineup of five Negroes in which the defendant may be distinguished as the shortest, as being in the center, as being the only suspect with a visible bandage (apparently a band-aid, placed diagonally to the right of his right eye), and as being the only one with any hirsute adornment (a trace) on his chin. Several, including the defendant, have mustaches. The witness testified that the defendant was the suspect he identified as the intruder.

Thereupon the defendant interposed the following objection, "At this time, your Honor, I would merely renew my objection to the in-court identification based upon the *Stovall, Wade* and *Gilbert* cases. It seems to me that the burden under those cases is on the district attorney to establish by, in the words of the Court, clear and convincing evidence that the previous lineup to which the individual has here testified was not so suggestive as to taint the in-court identification which occurred here in this court today. The cases are fairly clear on that, I believe."

The prosecutor then asked the witness, "Do you remember this defendant from observing him on the night that he was in your house?" The witness answered, "Yes." The court then overruled the objection.

■ ▪ In this case the lineup occurred before June 12, 1967. (The card on which the witness indicated his choice indicates that it occurred on April 16, 1967 following defendant's arrest.) The defendant, therefore, cannot predicate error on the fact that he was not represented by counsel at the lineup. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 296-301 [18 L.Ed.2d 1199, 1203-1205, 87 S.Ct. 1967]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]; and cf. *United States* v. *Wade* (1967) 388 U.S. 218, 228-239 [18 L.Ed.2d 1149, 1158-1164, 87 S.Ct. 1926]; and *Gilbert* v. *California* (1967) 388 U.S. 263, 269-272 [18 L.Ed.2d 1178, 1184-1186, 87 S.Ct. 1951].) He, however, is entitled to contend "that in any event the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." (*Stovall* v. *Denno, supra,* 388 U.S. at pp. 301-302 [18 L.Ed.2d at pp. 1205-1206]. See also *People* v. *Caruso, supra,* 68 Cal.2d at pp. 187-189; and *People* v. *Feggans, supra,* 67 Cal.2d at pp. 448-449.)

■ According to *Stovall*, ". . . a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, . . ." (388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]. See also *Foster* v. *California* (1969) 394 U.S. 440, 442 [22 L.Ed.2d 402, 406, 89 S.Ct. 1127]; and *Simmons* v. *United States* (1968) 390 U.S. 377, 383 [19 L.Ed.2d 1247, 1252, 88 S.Ct. 967].)

■ An examination of the record in the instant case reveals no suggestion other than what may be found in the composition of the lineup itself. The factors set forth above

upon which defendant relies, must be balanced against all of the circumstances. The defendant, according to his attorney is actually 5 feet tall. It would be difficult to assemble a group in which he would not be the shortest. His shortness is not unduly disparate within the group in which he was exhibited. The arrangement of the individuals, with the defendant in the center, does not appear to unnecessarily focus attention on him when viewed in relation to the respective heights of the others. The band-aid did not necessarily bear a relationship to the injury, which the witness testified he inflicted with the bat, because the witness testified that he swung the bat in a downward fashion toward the back of the intruder's head, and thought he had hit him on the back of the head. The witness described the intruder as having a mustache which came down around his lips and into a beard by his chin. From the photograph the thin hair growth on defendant's chin is scarcely distinguishable from the shadows on the chins of others in the lineup. It is concluded that the lineup was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny defendant due process of law. (See *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 273 [70 Cal.Rptr. 438, 444 P.2d 110]; *People* v. *Neal* (1969) 271 Cal.App.2d 826, 833-834 [77 Cal.Rptr. 65]; *People* v. *Hughes* (1969) 271 Cal.App.2d 288, 290-291 [76 Cal.Rptr. 369]; *People* v. *Henley* (1969) 269 Cal.App.2d 263, 272-273 [74 Cal.Rptr. 611]; *People* v. *Tarpley* (1968) 267 Cal.App.2d 852, 854-855 [73 Cal.Rptr. 643]; *People* v. *Lasiter* (1968) 265 Cal.App.2d 361, 365-367 [71 Cal.Rptr. 218]; *People* v. *Avina* (1968) 264 Cal.App.2d 143, 145 and 146-148 [70 Cal.Rptr. 235]; *People* v. *Graves* (1968) 263 Cal.App.2d 719, 741-742 [70 Cal.Rptr. 509]; *People* v. *Airheart* (1968) 262 Cal.App.2d 673, 677-679 [68 Cal.Rptr. 857]; and *Simmons* v. *United States, supra,* 390 U.S. 377, 383-386 [19 L.Ed.2d 1247, 1252-1254]. Cf. *Foster* v. *California, supra,* 394 U.S. 440, 441-444 [22 L.Ed.2d 402, 405-407]; *People* v. *Caruso, supra,* 68 Cal.2d 183, 187-188; *People* v. *Menchaca* (1968) 264 Cal.App.2d 642, 644-645 [70 Cal. Rptr. 843]; *People* v. *Hogan* (1968) 264 Cal.App.2d 254, 257-262 [70 Cal.Rptr. 448]; and *People* v. *Douglas* (1968) 259 Cal.App.2d 694, 697 [66 Cal.Rptr. 492].)

In any event, the trial court after listening to all the testimony and observing the demeanor of the witness, and the photograph of the lineup, was warranted in finding that the witness, as he so testified, identified the defendant in the

courtroom from the observations he made on the night of the incident. (*People* v. *Hughes, supra,* 271 Cal.App.2d 288, 291; *People* v. *Lasiter, supra,* 265 Cal.App.2d 361, 367; *People* v. *Airheart, supra,* 262 Cal.App.2d 673, 679; and see *People* v. *Caruso, supra,* 68 Cal.2d 183, 189-190; *People* v. *Menchaca, supra,* 264 Cal.App.2d 642, 645; *People* v. *Hogan, supra,* 264 Cal.App.2d 254, 262; and *People* v. *Douglas, supra,* 259 Cal.App.2d 694, 698.) Unlike those cases tried before June 12, 1967, in this case the issues raised by the ''lineup cases'' were fully argued to the court, and the court indicated, in the course of the argument on the merits, that it was accepting the in-court identification.

Defendant's present objection to the admission in evidence of the photograph of the lineup and of a card, on which the victim's son placed his designation of the person he identified, is self-defeating and unwarranted. Without that evidence there could be no issue as to fairness of the lineup procedure. Its admission on the merits for the prosecution would appear to depend upon an implied finding that it was fair. Nevertheless, even when the issue of fairness is resolved against the defendant, if the evidence concerning the lineup procedure raises any question of fairness, it may be used by the defendant to impeach the in-court identification of the witness. (See *People* v. *Douglas, supra,* 259 Cal.App.2d 694, 698.) Here the defendant made no objection to the admission in evidence of the exhibits in question, as distinguished from the testimony resulting in the in-court identification. It must be assumed that he waived any right to have their consideration limited to the preliminary question of fairness, to the exclusion of the weight they might lend to the issues posed by the merits of the case.

No error is found in the rulings on admission of evidence concerning the identification of defendant by the first victim's son.

*Evidence of Other Offense*

The defendant was charged with, and denied, a prior conviction of burglary in 1960. In support of this conviction, the prosecution offered a certified copy of a conviction for burglary suffered by James Lewis Elder in Los Angeles County on August 15, 1960. It was received in evidence over defendant's objection that a photograph attached to the certified copy was not a proper part of the record of conviction.

In addition, over defendant's objection that it was too remote, the prosecution introduced the testimony of the victim of that burglary to show common plan, scheme, design and intent. She testified that in 1960 she had been residing with her then husband in Los Angeles. Shortly after midnight, on April 18, 1960, she was awakened by a hand on her throat. Her assailant, whom she identified as the defendant in this action, said that if she screamed he would kill her and that he wanted her. She tried to convince him that he was making a mistake and that he did not even know her. She then tried to hit him with the telephone by the bed but he knocked it out of her hand, ripped her nightgown off and began to attack her. He took a pillow from the bed and placed it over her head to muffle her screams and had intercourse with her. While this was happening, there was a knocking on the door and she realized it was her husband. Her assailant permitted her to go to the door, warning her he was right behind. She opened the door and told her husband that there was a man in the house just behind her. The man jumped out of the dinette window. Her former husband set out in pursuit and returned with the defendant.

Her former husband, then and at the time of trial a Los Angeles police officer, testified that he pursued a man who jumped out of a window after his ex-wife had opened the door, and that he chased and captured the defendant after firing one shot.

■ "The relevant principles [governing the admission of evidence of other offenses] were fully stated by us in the recent cases of *People* v. *Kelley* (1967) 66 Cal.2d 232, 238-239 . . . , and *People* v. *Haston* (1968) 69 Cal.2d 233, 244-245 . . . As we there indicated in greater detail, evidence of other crimes is inadmissible as regards guilt when it is offered solely to prove criminal disposition because the probative value of such evidence as to the crime charged is outweighed by its prejudicial effect. However, such evidence may be properly admissible if it is offered to prove a fact material to the charged crime and meets the general tests of relevancy as to such fact. ■ '[T]he general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' (*People* v. *Kelley, supra,* 66 Cal.2d 232, 239, paraphrasing *People* v. *Peete* (1946) 28 Cal.2d 306, 315 . . .) ■ Such evidence should be scru-

tinized with great care, however, in light of its inherently prejudicial effect, and should be received only when its connection with the charged crime is clearly perceived.'' (*People* v. *Durham* (1969) 70 Cal.2d 171, 186-187 [74 Cal.Rptr. 262, 449 P.2d 198].)

In this case the defendant denied his presence at the immediate scene of both offenses. For the first, he claimed alibi; and for the second, that he had merely blundered into the stairway of the building. He also claimed and claims (see below) that the evidence was insufficient to show that the intruder had a felonious intent on either occasion. The evidence was, therefore, relevant on both the issue of identity and the issue of intent.

''When, as in the instant case, a primary issue of fact is whether or not defendant rather than some other person was the perpetrator of the crime charged, evidence of other crimes is ordinarily admissible if it discloses a distinctive *modus operandi* common to both the other crimes and the charged crime. [Citations.]'' (*People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91], and see discussion pp. 238-251; and *People* v. *Cavanaugh, supra,* 69 Cal. 2d 262, 272-273.)

''It is clear, of course, that the admission of other-offenses evidence to prove identity is essentially a matter within the sound discretion of the trial court. [Citations.] . . . The important point to be made is that, when such evidence is introduced for the purpose of proving the identity of the perpetrator of the charged offense, it has probative value only to the extent that *distinctive* 'common marks' give logical force to the inference of identity. If the inference is weak, the probative value is likewise weak, and the court's discretion should be exercised in favor of exclusion.'' (*People* v. *Haston, supra,* at p. 246.)

The defendant points out that offenses charged and the prior offense have the following differences: different victims; a different approach in that in the 1960 offense the assailant grasped the victim's throat and in the first of the present offenses he fondled his victim and in the second merely put his hand over the girl's mouth; in the earlier offense the assailant made known his intent and violently accomplished it, whereas in the present offenses he fled without using force on his victims; and in the former offense he selected a lone victim, whereas in the present offenses the intruder on each occasion entered a room with multiple occupants.

The People contend that sufficient similarity appears from the facts that the defendant on each occasion entered a bedroom in the nighttime, made advances toward a prospective victim, threatened the victim if she screamed, and in two occasions attempted to use a pillow to silence the victim's outcries. They assert that further similarity in the present offenses was precluded by the resistance encountered and the intruder's flight.

An examination of those cases involving evidence of other offenses to which the court's attention has been directed[1] reveals that, with a few notable exceptions, there is a tendency to use the phrase common plan, scheme or design as a passport to admission without analyzing the specific issue which makes the evidence relevant, as framed by the evidence in the particular case. (See *People* v. *Covert* (1967) 249 Cal.App.2d 81, 86 [57 Cal.Rptr. 220].) In *Covert,* the court categorized four situations in which such evidence was admissible, namely: "first . . . a plot to commit both the offense charged and the prior offense offered in evidence; second . . . *modus operandi,* a characteristic method employed by a defendant in the performance of repeated criminal acts . . . [third] the defendant's earlier sexual activity with the prosecuting witness, offered to show the defendant's lewd disposition toward that very person . . . fourth . . . the defendant's separate but similar schemes to acquire property . . . to show the defend-

---

[1]*People* v. *Durham* (1969) 70 Cal.2d 171, 186-189 [74 Cal.Rptr. 262, 499 P.2d 198]; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 272-273 [70 Cal.Rptr. 438, 444 P.2d 110]; *People* v. *Haston* (1968) 69 Cal.2d 233, 241-251 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 238-243 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Ragen* (1968) 262 Cal.App.2d 392, 399-401 [68 Cal.Rptr. 700]; *People* v. *Debnam* (1968) 261 Cal.App.2d 206, 211 [67 Cal.Rptr. 692]; *People* v. *Gray* (1968) 259 Cal.App.2d 846, 850-853 [66 Cal.Rptr. 654]; *People* v. *Kerry* (1967) 249 Cal.App.2d 246, 250-252 [57 Cal.Rptr. 289]; *People* v. *Covert* (1967) 249 Cal.App.2d 81, 83-89 [57 Cal.Rptr. 220]; *People* v. *Baskett* (1965) 237 Cal.App.2d 712, 715-716 [47 Cal.Rptr. 274] [distinguished *People* v. *Covert, supra,* 249 Cal.App.2d at p. 85; and disapproved in part *People* v. *Kelley, supra,* 66 Cal.2d at p. 243, fn. 5]; *People* v. *Honaker* (1962) 205 Cal.App.2d 243, 244-245 [22 Cal.Rptr. 829] [disapproved in part in *People* v. *Kelley, supra,* at p. 244]; *People* v. *Minkowski* (1962) 204 Cal.App.2d 832, 849-851 [23 Cal.Rptr. 92]; *People* v. *Malloy* (1962) 199 Cal.App.2d 219, 229-234 [18 Cal.Rptr. 545] [disapproved in part in *People* v. *Kelley, supra,* at p. 244]; *People* v. *Crisafi* (1960) 187 Cal.App.2d 700, 706-707 [10 Cal.Rptr. 155]; *People* v. *Cassandras* (1948) 83 Cal.App.2d 272, 279-282 [188 P.2d 546] [disapproved on other grounds *People* v. *Collins* (1960) 54 Cal.2d 57, 59-60 [4 Cal.Rptr. 158, 351 P.2d 326]; and see Evid. Code, § 1101, subd. (b).

ant's motive." (249 Cal.App.2d at pp. 86-87. See also Evid. Code, § 1101, subd. (b).).

If the evidence of the prior offense was offered on the issue of identity alone the conclusion expressed in *People* v. *Haston, supra,* is applicable: ". . . the common marks . . . considered singly or in combination, are insufficiently distinctive to raise the inference of identity necessary to invest the other-offense[s] evidence with significant probative value, and . . . the admission of this evidence on the basis of these marks would constitute an abuse of discretion." (69 Cal.2d at pp. 248-249, fn. omitted. See also *People* v. *Cavanaugh, supra,* 69 Cal.2d at pp. 272-273, and *People* v. *Baskett* (1965) 237 Cal.App.2d 712, 717 [47 Cal.Rptr. 274] [see comment on same case fn. 1, *supra*].)

In this case, however, there was no prejudice from the admission of the evidence. The case was tried by the court. There was no instruction to a jury that it could consider the evidence of the prior offense as bearing on the identity of the perpetrator of the two current offenses. The judge, upon listening to argument in connection with the final submission of the case, expressed himself as satisfied that the defendant was the perpetrator of the offense on the second occasion when he was apprehended and identified by one of the girls involved. He acknowledged that he had had a problem with the identification of the first of the current incidents, but resolved it against the defendant because the witness was positive, and was corroborated by the defendant's inconsistent statements concerning how he received the cut on his head and by the identity of the type of blood found at the scene with that of defendant.

The court correctly considered the evidence of the 1960 offense, and it was properly admitted to show that the intruder, having been identified as the defendant, entered on each occasion with the intent to rape. In *People* v. *Durham, supra,* the court observed, "There is ample authority for the admission of evidence of prior criminal activity when such evidence provides considerable circumstantial proof of the actor's mental state at the time of the charged offense." (70 Cal.2d at p. 188.) In *People* v. *Kelley, supra,* the court laid down the following rules as governing the admission of a prior offense on the issue of intent, "It is clear that the traditional exceptions of motive, intent, etc., apply to cases involving sex offenses, . . . It is not and should not be the law, however, that defendant's not guilty plea places his intent in

issue so that proof of sex offenses with others is *always* admissible. Such evidence is admissible in cases where the proof of defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident. [Citations.] But where the acts, if committed, indisputably show an evil intent and the defendant does not specifically raise the issue of intent, the better reasoned cases hold that evidence of other crimes is admissible only when they were performed with the prosecuting witness [citation], or where the offenses are not too remote and are similar to the offense charged and are committed with persons similar to the prosecuting witness. Then they are admissible as showing a common scheme or plan. [Citations.]'' (66 Cal.2d at pp. 242-243. See also *People* v. *Nye* (1951) 38 Cal.2d 34, 37-38 [237 P.2d 1]; *People* v. *Kerry* (1967) 249 Cal.App.2d 246, 251 [57 Cal.Rptr. 289]; *People* v. *Covert, supra,* 249 Cal.App.2d 81, 88; *People* v. *Honaker* (1962) 205 Cal.App.2d 243, 244 [22 Cal.Rptr. 829]; and *People* v. *Malloy* (1962) 199 Cal.App.2d 219, 233 [18 Cal.Rptr. 545].) In *Kelley* the court referred to the situation where the defendant admits touching the victim but claims an innocent intent. (66 Cal.2d at p. 241.) Here there was a complete denial of being present at the immediate scene of the alleged offense. The defendant, however, did, and does (see below), urge that the acts of the intruder could not give rise to a finding of intent to rape. Once the identity is established ''the evidence is properly admitted where the intent accompanying the act is equivocal, or where it is claimed by the defendant that the act was the result of mistake, accident or inadvertence. [Citations.]'' (*People* v. *Honaker, supra,* 205 Cal.App.2d at p. 244.)

The fact that the prior offense occurred almost seven years before the events giving rise to the charges at issue affects the weight not the admissibility of the evidence. (*People* v. *Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Kerry, supra,* 249 Cal.App.2d 246, 252.)

It is unnecessary in this case to decide whether the evidence of the prior offense, lacking sufficient distinctive characteristics to be admissible on the issue of identity, could be given to a jury on the issue of intent under a qualified instruction. It is sufficient for this case to determine that the admission of the evidence did not constitute prejudicial error in the trial before a court which found other evidence of identity sufficient.

*Sufficiency of the Evidence*

 The general rule governing the question raised by defendant is stated in *People* v. *Kittrelle* (1951) 102 Cal. App.2d 149 [227 P.2d 38], as follows: "The intention with which an accused enters the house of another is a question of fact and where the circumstances of a particular case and the conduct of the accused reasonably indicate his purpose in doing so is to commit a larceny or any felony a verdict of guilty of the crime of burglary will not be disturbed on appeal. [Citations.]" (102 Cal.App.2d at p. 156. See also *People* v. *Bard* (1968) 70 Cal.2d 3, 5 [73 Cal.Rptr. 547, 447 P.2d 939]; *People* v. *Padilla* (1962) 210 Cal.App.2d 541, 544 [26 Cal.Rptr. 765]; and cf. *People* v. *Tidmore* (1963) 218 Cal.App.2d 716, 720 [32 Cal.Rptr. 444].)

 "It is defendant's intention at the time he made the entry that is determinative, since burglary arises when a person enters the house of another with the intent to commit a felony. [Citation.] What occurs later—completion of the felony, abandonment, or capture—is irrelevant to the original crime. [Citation.]" (*People* v. *Bard, supra,* 70 Cal.2d 3, 5. See also *People* v. *Shaber* (1867) 32 Cal. 36, 38; and *People* v. *Novo* (1936) 12 Cal.App.2d 525, 528 [55 P.2d 915]; and cf. *People* v. *Failla* (1966) 64 Cal.2d 560, 564-565 [51 Cal.Rptr. 103, 414 P.2d 39].)

"The question whether the intent existed is one for the jury to determine from the conduct of the defendant and the surrounding circumstances." (*People* v. *Meichtry* (1951) 37 Cal.2d 385, 389 [231 P.2d 847]. See also *People* v. *Failla, supra,* 64 Cal.2d 560, 564-565; and *People* v. *Padilla, supra,* 210 Cal.App.2d 541, 544.)

In this case on each count, burglary of each of the premises and the assault with intent to commit rape on the first victim, the requisite intent is the intent to commit rape. In *People* v. *Nye* (1951) 38 Cal.2d 34 [237 P.2d 1], the court ruled, "The crime of assault with intent to commit rape was committed, if defendant intended to have sexual intercourse with his victim and to use force to overcome her resistance. [Citations.] Defendant concedes that an assault on Mrs. P. was shown by the evidence, but contends that his conduct, standing alone, does not show the intent with which he made the assault.

"When a strange man enters a woman's bedroom, covers her mouth with his hand, grasps her wrist while she screams and kicks, releases her when she bites his hand, and makes no effort to take any property, it is reasonable to infer that he

intended to commit rape, particularly when such an intent is shown by his attempt to rape another woman under similar circumstances." (38 Cal.2d at p. 37. See also *People* v. *Bard*, *supra*, 70 Cal.2d 3, 6; *People* v. *Padilla*, *supra*, 210 Cal.App.2d 541, 543-544; and *People* v. *Kittrelle*, *supra*, 102 Cal.App.2d 149, 156[2]; and cf. *People* v. *Tidmore*, *supra*, 218 Cal.App.2d 716, 720.)

In *Bard* the victim awoke at 2:55 a.m. to find a man she had never seen before in bed with her. He was fondling her private parts with his hands underneath her clothing. She got out of bed and told him to leave, and he did so. (70 Cal.2d at p. 4.) In *Padilla* the victim awoke at about 5:30 a.m. and found a stranger sitting on her bed. She asked who he was and the intruder answered, "It's me." When she tried to get up the intruder pushed a handkerchief over her face and she struggled to get free and began screaming. The intruder thereupon ran out of the rear of the house. (210 Cal. App.2d at p. 542.) In *Kittrelle*, the victim was awakened shortly before 5 a.m. by a movement of the bedcovers at the foot of her bed, as if someone were pulling at them. On opening her eyes she observed a man leaning over the foot of the bed. When his presence was discovered he fled. (102 Cal. App.2d at pp. 152 and 156.)

In this case the first victim was awakened around 3 a.m. when she felt the intruder's hand between her legs on her private parts. He slid his hand under the covers and right out again quickly. On awakening she rolled over and saw him standing at the side of the bed. She screamed and he came down on her arm with his body on top of hers holding her by the arms. He said, "don't scream; don't scream; if you scream again I'll kill you." The victim whispered to him, "I won't scream; I won't scream. But there are two little boys in this room; I'm not alone. You best go back the way you came." He repeated, "I know; I know." He reached for the pillow to pull up in the victim's face, and she cried out, "Jack, George, quick, he's going to suffocate me." The intruder let go, and the victim observed her son swinging the bat at the intruder as related above. This evidence, in the light of the precedents reviewed, permits and supports the

[2]In *People* v. *Bard*, *supra*, the vacated opinion of the Court of Appeal [69 Cal.Rptr. 418] attempted to distinguish the ruling of *People* v. *Kittrelle*, *supra*, which sustained the sufficiency of the evidence, on the grounds it was only dictum. (69 Cal.Rptr. at p. 420.) The Supreme Court, however, approved *Kittrelle* as a precedent on the factual issue. (70 Cal.2d at p. 7.)

inference that the defendant entered and assaulted the victim with the intent to commit rape.

In the second incident the 10½-year-old daughter of the household, who was in the middle of three girls sleeping crossways in a bed, was awakened around 12:30 a.m. by a voice saying, ''Cool it; cool it; cool it.'' As she went to scratch her head she felt what she believed to be a Negro's hair. The intruder had a hand over her mouth, and put his leg up over the girl nearest the headboard, as though he were going to get into the bed. She pushed his hand away and got up and screamed. The intruder left the room saying, ''Oh man; oh man.''

The girl who was sleeping across the foot of the bed awoke and observed the intruder standing right in front of the girl in the middle. She saw him put his hand over her mouth, and lift one leg as though he were going to sit or lay on the bed. She joined her companions in screaming, and observed the intruder leave as he said, ''Oh man; oh man.'' This evidence, although weaker than that relating to the first incident, is, when considered with the assault which occurred less than 48 hours before, as persuasive as that in *People* v. *Nye, supra,* and is sufficient to sustain the finding of the requisite intent for the burglary charged in the third count.

The defendant seeks to come within the principle of *People* v. *Tidmore, supra,* where the court cited with approval, '' 'It is not enough to prove merely a purpose to have intercourse.' (1 Witkin, Cal. Crimes (1963) § 262, p. 247; see *Roberts* v. *State,* 136 Tex.Crim.Rep. 138 . . .)'', and concluded, ''An analysis of the evidence in the light most favorable to the People compels the conclusion that nothing more was shown as to the defendant's intent than that he desired to have sexual intercourse with Mrs. Hughes. While his conduct was reprehensible, there was no proof that he intended to accomplish his purpose by use of force rather than by persuasion.'' (218 Cal.App.2d at p. 720.)

In *People* v. *Bard, supra,* the court stressed the fact that the victim, as in this case, was a complete stranger to the intruder. (70 Cal.2d at p. 6.) It distinguished *Tidmore* as follows: ''In *People* v. *Tidmore, supra,* 218 Cal.App.2d 716, also relied on by defendant, there was no physical contact of any kind. In addition, the defendant had known, and apparently admired, the victim for a number of years. In one of his pretrial statements, he had indicated that it was his intention to gain entry and persuade the victim to have intercourse

with him. He had sought to enter through a window, but his presence was observed by the victim while he had only his head and one of his hands in the room and was pushing a dresser away from a window. The victim went to the kitchen and obtained a knife. Upon her return, the defendant had left. Under these circumstances, it was held that nothing more had been shown as to the defendant's intent than that he desired to have sexual intercourse with the victim." (*Id.*, p. 7.)

It is also noted that the entries and the assault could have been effected with the intent to commit a misdemeanor, or even some noncriminal act. (See *People* v. *Failla, supra,* 64 Cal.2d 560, 564-565.) As set forth above, however, the question of the intruder's intent is a factual one. Since the evidence is sufficient to support the implied findings of the trial court, they must govern the disposition of the case.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 20, 1969.